## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SHANE T. M.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 19-cv-970-GCS[2] |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM and ORDER

**SISON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits ("DIB") pursuant to 42 U.S.C. § 423.

### PROCEDURAL HISTORY

Plaintiff applied for disability benefits in May 2016, alleging disability as of September 25, 2014.   After holding an evidentiary hearing, an ALJ denied the application on September 27, 2018.   (Tr. 25, 35).   The Appeals Council denied review, and the decision of the ALJ became the final agency decision.   (Tr. 1).   Administrative remedies

---

[1]       In keeping with the court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns.   See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2]       This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).   See, Docs. 10 & 19.

have been exhausted, and a timely complaint was filed in this Court.

## ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following points:

1. The ALJ failed to evaluate properly the residual functional capacity.

2. The ALJ failed to evaluate properly step 2 of the sequential evaluation.

## APPLICABLE LEGAL STANDARDS

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.   Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed?; (2) Does the plaintiff have a severe impairment?; (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations?; (4) Is the plaintiff unable to perform his former occupation?; and (5) Is the plaintiff unable to perform any other work?   *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step three or five leads to a finding that the plaintiff is disabled.   A negative answer at any step, other than at step three, precludes a finding

of disability.   The plaintiff bears the burden of proof at steps one through four.   Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show that there are jobs existing in significant numbers in the national economy which the plaintiff can perform.   *See Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."   42 U.S.C. § 405(g).   Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).   The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010)(citing cases).

## THE DECISION OF THE ALJ

The ALJ followed the five-step analytical framework described above. He determined that Plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. He was insured for DIB through December 31, 2019.

The ALJ found that Plaintiff had the severe impairments of diabetes mellitus, diabetic retinopathy, diabetic neuropathy, bilateral carpal tunnel syndrome, degenerative joint disease of the bilateral shoulders, degenerative disc disease of the lumbar spine, obesity, and depressive disorder.

The ALJ found Plaintiff had the residual functional capacity ("RFC") to do the following:

> Perform sedentary work . . . except he can occasionally push and/or pull with the bilateral lower extremities, frequently but not repetitively push and/or pull with the bilateral upper extremities, with no ladders, ropes or scaffolds, occasional ramps or stairs, occasional balancing, stooping, kneeling, crouching and crawling, and frequent reaching with the bilateral upper extremities. He cannot perform tasks requiring depth perception due to monocular vision, read printed materials smaller than traditional newsprint, or work with objects smaller than keys. He must avoid concentrated exposure to extreme heat and avoid all hazards. He is further limited to remembering, understanding and attending to simple, routine tasks.

(Tr. 30). Based on the testimony of a vocational expert, the ALJ concluded that Plaintiff is unable to perform any past relevant work.

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to Plaintiff's arguments.

1.      **Agency Forms**

Plaintiff was born in 1972 and was 46 years old on the date of the ALJ's decision. (Tr. 215).   He worked as a "tool measurer" from September 2001 to September 2014. (Tr. 221).

In a Function Report submitted in May 2016, Plaintiff said he has weakened hands and feet, is unable to lift heavy objects, has feet tingling, has trouble sleeping, oversleeps, and his impairments affect his daily personal care.   Plaintiff said he cannot stand in the kitchen for long, has difficulties holding utensils, has difficulties with carrying, bending and stooping, and his conditions affect his lifting, squatting, bending, standing, walking, kneeling, stair climbing, and task completion.   Plaintiff said he can lift around twenty pounds, can only walk about an eighth of a mile before stopping for ten minutes, and needs instructions repeated.   Plaintiff said he has problems with moving his arms due to bone spurs and arthritis in his shoulders.   (Tr. 248-255).

2.      **Evidentiary Hearing**

An attorney represented Plaintiff at the evidentiary hearing in June 2016.   (Tr. 42). The ALJ asked Plaintiff's counsel if there was anything they were still waiting on, and Plaintiff's counsel said no.   (Tr. 45).   Plaintiff said he voluntarily quit his job in

September 2014 because his conditions made it difficult for him to do his job, and he thought his employer wanted to get rid of him anyway.   (Tr. 49).   Plaintiff said he did not work after that because he was unable to hold on to things, his feet were numb, he constantly tripped over things, and he had depression and severe anxiety issues.   (Tr. 50).   Plaintiff said he saw a counselor once every three weeks for the past two years and his anxiety comes on randomly.   (Tr. 54-57).   Plaintiff said he cannot feel his feet or shins, he has diabetic necrosis, and he has carpal tunnel in his hands.   (Tr. 61).   Plaintiff said he has issues sleeping because he wakes up to urinate in the middle of the night or to change his diapers.   Plaintiff said the diuretic he uses for his leg swelling causes excessive bathroom use.   Plaintiff said he has a hard time with his shoulders when it comes to reaching behind him.   He said he gets cortisone shots for his shoulder issues, but the injections affect his sugars.   (Tr. 65-67).   Plaintiff said laying down helps his leg swelling.   (Tr. 70).

A vocational expert ("VE") testified that a person with Plaintiff's RFC could not perform their past work.   The ALJ presented hypotheticals to the VE which corresponded to the ultimate RFC findings.   The VE said there were other jobs that exist in the national economy that a person like Plaintiff could do such as unskilled hand packer positions, unskilled production work or assembly positions, and unskilled inspector, tester, and sorter positions.   (Tr. 74-76).

3.      **Relevant Medical Records**

a.      *Dr. Michael Adams*

Plaintiff presented to Dr. Adams, an internist, eight times between November 2013 and September 2015.   At these appointments, Plaintiff reported an acute kidney injury, headaches, sugars that both improved and worsened, both better and worsened diet habits, lack of exercise, and medication noncompliance.   (Tr. 421, 462, 464, 469, 471, 473-474, 477, 479, 484, 486, 489-491).   A physical exam revealed Plaintiff had good judgment, had a normal mood and affect, was active and alert, was oriented to time, place and person, had normal motor strength and tone, had normal movement of all extremities, had no tenderness, and had minimal to no edema of the feet.   (Tr. 464, 469, 473, 480, 486, 491).   The assessment included type two diabetes, obesity, low back pain, and headache, and plans included seeing an endocrinologist, continuing therapy, blood testing, back pain relief, and weight loss.   (Tr. 464, 470, 473, 476, 479-480, 486, 491-492). Recommendations consisted of glycemic control, renal insufficiency treatment with medications and antibiotics, and plans included checking renal and bladder ultrasounds to look for patency of renal veins, checking urinalysis with microscopy, and checking bladder pressure.   (Tr. 420, 425).

Plaintiff underwent an ultrasound of his kidney on January 8, 2014, and the

impression was, "[n]o evidence of hydronephrosis[3] or perinephric[4] fluid collection . . . Unable to obtain renal arterial Doppler."   (Tr. 401).

### b.    Dr. Bassim Assioun

Plaintiff presented to Dr. Assioun, a nephrologist, ten times between June 2016 and February 2018.   Plaintiff reported diabetes, chronic epigastria pain, chronic edema that improved at times, weight gain and loss, hypertension, blood sugar issues that sometimes improved, urinary incontinence, fatigue, chronic sores, dyspnea, lower extremity bilateral musculoskeletal pain, chronic back, shoulder, hand, and feet pain, CKD, arthritis, and neuropathy.   (Tr. 935, 953-954, 966-967, 982, 995, 1006, 1015-1016, 1020, 1028, 1036-1037).

Physical exams revealed obesity, edema that improved at times, alertness, orientation, normal mood, and no anxious or depressed feelings.   (Tr. 956, 968, 985, 998, 1009, 1018, 1023, 1031, 1039).   Dr. Assioun noted Plaintiff's bladder was mostly collapsed.   (Tr. 969).   The assessments included stage three to stage four CKD, dependent edema, hypertension, diabetic peripheral neuropathy, anemia, renal osteodystrophy, chronic low back pain, arthritis, diabetes, proteinuria, hyperkalemia[5],

---

[3]      Hydronephrosis refers to "the swelling of the kidneys when urine flow is obstructed in any of part of the urinary tract." https://medical-dictionary.thefreedictionary.com/hydronephrosis, visited on April 13, 2020.

[4]      Perinephric refers to "[s]urrounding the kidney in whole or part." https://medical-dictionary.thefreedictionary.com/perinephric, visited on April 13, 2020.

[5]      Hyperkalemia refers to "the presence of an abnormally high concentration of potassium in the blood." https://www.merriam-webster.com/medical/hyperkalemia, visited on April 20, 2020.

and bilateral shoulder pain.   (Tr. 938-939, 957, 969, 986, 991, 993-994, 1009-1010, 1018, 1032, 1040).   Plans included medication management, blood tests, urine tests, a low salt and potassium diabetic diet, and checking blood pressure and weight daily.   (Tr. 938-939, 957-958, 969-970, 986-987, 994, 999, 1010, 1018-1019, 1024, 1032-1033, 1040).

Plaintiff underwent an ultrasound of his kidneys on June 24, 2016, and the impression was, "1. UNREMARKABLE KIDNEYS. 2. DIFFUSE HEPATIC STEATOSIS.[6] 3. URINARY BLADDER IS COLLAPSED AND THEREFORE NOT WELL EVALUATED."   (Tr. 974).

> c.   *Dr. Frank Buda*

On August 16, 2016, Frank Buda, a state agency medical consultant, performed a case analysis and physical residual functional capacity assessment.   (Tr. 682-683).   Dr. Buda noted Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push and/or pull occasionally with lower extremities and frequently with upper extremities.   Dr. Buda said Plaintiff could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, and he said Plaintiff could never climb ladders/ropes/scaffolds.   Dr. Buda said Plaintiff should be limited with handling, fingering, and feeling but should be unlimited in reaching.   (Tr. 684-686).

---

[6]      Hepatic steatosis refers to a "fatty liver." https://medical-dictionary.thefreedictionary.com/Hepatic+steatosis, visited on April 13, 2020.

### d.    Dr. Elie Chahla

Plaintiff presented to Dr. Chahla, a gastroenterologist, twice between December 2017 and January 2018.   Plaintiff reported abdominal pain, fatigue, malaise, urinary incontinence, myalgias, arthralgias, intermittent headaches, dizziness, and weight gain. (Tr. 919, 925).   Physical exams revealed alertness, edema, an appropriate mood, and orientation.   (Tr. 923, 928-929).   Diagnoses included minimal chronic gastritis, fundic gland polyp and hyperplastic polyp.   (Tr. 923).   Assessments included anemia, acid reflux disease, abdominal pain and CKD, and plans included an EGD, avoiding trigger foods, optimizing glycemic control, possible abdominal imaging, weight loss, and medication management.   (Tr. 923-924, 930).

### e.    Dr. Vittal Chapa

On September 29, 2016, Dr. Chapa, a state agency medical consultant, conducted a physical consultative evaluation.   Plaintiff reported radiating low back pain, severe neuropathy in his feet and hands, numbness in his legs, obesity, shoulder bone spurs, arthritis in his shoulders, anxiety, depression, headaches, stage three CKD, sleep apnea, urinary incontinence, and fatigue.   A physical exam revealed edema, loss of pinprick sensation in both feet and lower legs, loss of position sense in both feet, diminished vibration sense in both feet, an ability to perform both fine and gross manipulations with both hands, and hand grips were 4/5 bilaterally.   (Tr. 705-706).   Lumbar spine x-ray findings included "[n]o compression fractures, disc spaces are well preserved. Mild

degree of arthritis. Arthritis of the sacroiliac joints."  (Tr. 712).   Diagnostic impressions included chronic lumbosacral pain syndrome, peripheral neuropathy, obesity, CKD, bilateral carpal tunnel syndrome, sleep apnea, urinary incontinence, and fatigue.   (Tr. 707).

### f.     Dr. Poornima Jayaramaiah

Plaintiff presented to Dr. Jayaramaiah, an endocrinologist, eleven times between July 2015 and December 2017, for management of type two diabetes and neuropathy. Plaintiff reported sometimes forgetting to take his medications, attention to diet, blood sugar issues, blood sugar improvement due to diet and medications, low blood sugars at night, ineffectiveness of neuropathy medication, lower extremity edema, urinary frequency and incontinence, joint pain, muscle aches, headache, leg numbness and tingling, insomnia, anxiety, depression, severe foot pain that interferes with sleep, consideration of bariatric surgery, shoulder issues that require potential shoulder surgery if he can reduce his blood sugars enough, CKD, and peripheral neuropathy.  (Tr. 527, 531, 535, 539, 541-543, 796, 799, 805, 811, 816, 822).

Despite some normal physical exams, other physical exams revealed morbid obesity, diminished vibratory, tactile and protective sensations of each foot, bilateral necrobiosis lipoidica diabeticorum[7], bilateral feet swelling, erythema, dryness, normal

---

[7]       Necrobiosis lipoidica diabeticorum refers to "a condition, in many cases associated with diabetes, in which one or more yellow, atrophic, shiny lesions develop on the legs." https://medical-dictionary.thefreedictionary.com/Necrobiosis+lipoidica+diabeticorum, visited on April 13, 2020.

judgment, normal insight, orientation to person, place and time, intact recent and remote memory, and normal mood and affect.   (Tr. 529, 531, 533-534, 537, 541, 545, 803, 808-809, 814, 819, 825).   Dr. Jayaramaiah noted peripheral neuropathy, high lipids, both an improvement and a worsening of Plaintiff's diabetes control due to things such as diet, worsening glycemic control, a necessity to see a neurologist for neuropathy, problems with tingling and numbness, high microalbumin in Plaintiff's urine, and stage three kidney disease.   (Tr. 530-531, 533-534, 538-539, 541, 796, 820, 822).   The assessments included type two diabetes, hypertension, hyperlipidemia, diabetic neuropathy, diabetic peripheral neuropathy, and microalbuminuria[8].   (Tr. 529-530, 534, 537, 541-542, 546-547, 803, 809, 814, 820-821, 825-826).   Plans included blood sugar tests, CMP tests, urine microalbumin tests, lipid tests, seeing a dietitian, diabetes education classes, medication management, insulin management, and good foot care.   (Tr. 529-530, 534, 537, 541-542, 546-547, 796, 803, 809, 814-815, 820-821, 825-826).

> ### g.   *Charles Massie, CADC*

On March 8, 2016, Plaintiff presented to Charles Massie, a certified alcohol and drug counselor ("CADC"), reporting concerns with anger, mood swings, depression, and anxiety.   Plans included continuing therapy.   (Tr. 518).

---

[8]   Microalbuminuria refers to "[a] slight increase in urinary albumin excretion that can be detected using immunoassays but not using conventional urine protein measurements; an early marker for renal disease in patients with diabetes." https://medical-dictionary.thefreedictionary.com/Microalbuminuria, visited on April 13, 2020.

### h.    Jessica Munton, LCPC

Plaintiff presented to Jessica Munton, a licensed clinical professional counselor, at Chestnut Health Systems on July 5, 2017, reporting anxiety that limits him from leaving the house, depression, refraining from work due to physical and mental illness, decreased frustration tolerance, difficulty sleeping, sleeping excessively, isolating behavior, lack of motivation and drive, loss of interest in things he used to enjoy, low energy, and difficulties managing work responsibilities.   Ms. Munton recommended individual counseling.   (Tr. 755-757).

### i.    Kathleen Murphy, PT

Plaintiff presented to Kathleen Murphy, a physical therapist, on June 7, 2016, reporting a bilateral shoulder pain rating of four out of ten.   Plaintiff reported moderate difficulty with pushing, pulling, grasping, carrying, standing, and moving from lying to seated; much difficulty with reaching, lifting, and rolling over; and little to no difficulty with lying flat and sitting.   (Tr. 613-614).   Plaintiff rated his pain as ten out of ten at worst and one out of ten at best.   Plaintiff said his symptoms were constant, throbbing, and shooting pain and numbness.   Plaintiff further noted the symptoms worsen with lifting, dressing and housework, and improve with sitting and lying down.   Plaintiff said his symptoms make it difficult to sleep.   (Tr. 616-617).   Plaintiff reported frequently feeling down, depressed and hopeless with little interest or pleasure in doing things he typically enjoys.   (Tr. 619).   Ms. Murphy noted bilateral shoulder pain, stiffness, joint

effusion, muscle weakness, and muscle spasms, and plans included returning to physical therapy two to three times per week.   (Tr. 615).

       *j.*     ***Dr. Riaz Naseer***

Plaintiff presented to Dr. Naseer, a neurologist, eight times between January 2016 and February 2018.   Plaintiff reported neuropathy, shoulder pain aggravated by lifting, back pain aggravated by stair climbing, lifting and walking, anxiety, depression, mood swings, paresthesias, burning hand and feet pain, decreased mobility, joint tenderness, numbness of his bilateral hands and feet, tingling, leg pain aggravated by walking, edema, sciatica, migraines, diabetes, hypertension, and a decrease in Neurontin due to renal insufficiency.   (Tr. 446, 497, 502, 504, 668, 673-674, 727, 732, 738, 740).   Outside of some normal physical exams, Plaintiff's physical exams revealed obesity, tenderness of the lumbar spine and left shoulder with moderately reduced range of motion, no edema, orientation to time, place, person and situation, an appropriate mood and affect, and normal insight and judgment.   (Tr. 499-500, 505, 670-671, 675, 729, 735, 741).   The assessments included bilateral carpal tunnel syndrome, neuropathy, sciatica, anxiety, depression, and shoulder pain.   (Tr. 446, 497, 500, 505-506, 671, 676, 730, 735, 741).   Plans included diagnostic evaluations, an orthopedic surgeon referral, a nerve conduction and electromyography ("EMG") test, dietary counseling and surveillance, and medication management.   (Tr. 500, 505-506, 508, 671, 676, 730, 735-736, 741).

### k.    *Orthopedic and Sports Medicine Clinic*

Plaintiff presented to the Orthopedic and Sports Medicine Clinic eight times between June 2016 and February 2018.   Plaintiff reported bilateral shoulder pain that is aggravated with overhead activity, pinching sensations at the tops of the shoulders, anxiety, diabetes, difficulty walking, frequent urination, joint pain, loss of bladder control, neck/back pain, numbness/tingling in the arm/hand, swelling in legs, weight gain, pain when lifting, ninety percent improvement in shoulder pain due to injections, sixty percent improvement in shoulder pain, discontinuation of physical therapy due to family conflicts, erratic blood pressure, and efforts to lower his A1C in anticipation of a shoulder arthroscopy.   (Tr. 631-633, 638-640, 759, 765-766, 769-770, 773, 777, 780).

Physical exams revealed morbid obesity, bilateral joint tenderness on palpation, both positive and negative impingement signs of the shoulders, negative wrist tests, no hand grip weakness in either hand, and no tenderness on palpation over the cervical spine.   (Tr. 633, 640-641, 760-761, 766-767, 770-771, 774-775, 778-779, 781).   Diagnoses and impressions included bilateral shoulder pain, primary osteoarthritis in the right and left shoulders, moderate DJD of both shoulders, type two diabetes, and rotator cuff tendonitis of both shoulders.   (Tr. 634, 641-642, 761, 767-768, 771, 775, 779, 782).   Plans included injections, resting and icing his shoulders, blood sugar monitoring, lowering his A1C, weight loss, physical therapy, wearing compression stockings, daily stretches, a possible MRI if injections proved ineffective, and medication management.   (Tr. 634, 641,

761, 767, 771, 775, 779, 782).

Plaintiff underwent an x-ray of his left shoulder on June 2, 2016, and the impression was "1) Mild DJD of left AC joint. 2) Moderate DJD of left glenohumeral joint."   Plaintiff also underwent an x-ray of his right shoulder that day, and the impression was "1) Moderate DJD of right AC joint and glenohumeral joint."   (Tr. 636-637).   Plaintiff underwent injections and a left shoulder x-ray on August 9, 2017, and the impression was "1) Severe DJD of left AC joint. 2) Mild DJD of left glenohumeral joint." (Tr. 763).

### l.   Dr. Sherman Sklar

Plaintiff presented to Dr. Sklar, a state agency psychologist, on July 21, 2016, for a psychological consultative evaluation.   Plaintiff reported anxiety, mental difficulties with getting out of bed, feeling extremely limited due to diabetes, being bullied throughout his life, intermittent sleep, being socially withdrawn, depression from negative social expectations and his physical discomfort, low self-worth, and guilt.   Dr. Sklar noted Plaintiff was logical, cooperative, had a normal pace of speech, was mildly down, and was oriented to person, place and time. Ultimately, Dr. Sklar noted Plaintiff's responses to his cognitive questions indicated no deficits.   Diagnoses included mood disorder due to diabetic conditions with depressed features.   (Tr. 658-661).

### m.   Dr. Matthew Wilkinson

Plaintiff presented to Dr. Wilkinson, an internist, twelve times between October

2015 and December 2017.  Plaintiff reported dizziness, light-headedness, back pain, diabetes, migraines, significant parasthesias, burning/shooting pains to his hands and feet, chronic left knee and left shoulder pain, renal insufficiency depression, type two diabetes, CKD, hyperlipidemia, attempting to follow a better diet, necrobiosis diabeticorum to his shins, anxiety, PTSD, fatigue, painful kidneys, nocturnal incontinence, irritation, peripheral neuropathy, improvement with an insulin change, increased lower extremity edema, knee pain, and weight gain.  (Tr. 582, 586, 591, 595, 598, 714, 870, 876-877, 883, 889, 894, 909).

Dr. Wilkinson noted shoulder pain, migraines, diabetic peripheral neuropathy, chronic necrobiosis in Plaintiff's shins, increasing urine volume, and noncompliance which lead to peripheral neuropathy.  (Tr. 598, 871, 910).  A physical exam revealed morbid obesity, no back tenderness, no edema, normal range of motion, pain-limited abduction to ninety degrees of the left shoulder, normal flexion of the left shoulder, orientation, alertness, and an appropriate affect.  (Tr. 582, 586, 591, 595, 598-599, 714, 870-871, 877, 883-884, 889-890, 894-895, 909-910).

The assessment included acute renal insufficiency, diabetic peripheral neuropathy, hyperkalemia, bilateral shoulder pain, depression, type two diabetes, hypertension, hyperlipidemia, microalbuminuria, stage three to stage four CKD, chronic low back pain, necrobiosis lipoidica diabeticorum, anemia, arthritis, exertional dyspnea,

renal osteodystrophy, sciatica, dysuria[9], polyuria[10], lethargy, myalgia, and migraine. (Tr. 582, 586-588, 591, 593, 597, 602, 717-718, 874, 880-881, 886-887, 892, 898. 915).   Plans included an orthopedic consultation, blood tests, electrocardiograms ("EKG"), a neurology referral, a urology referral, physical therapy, a dermatology referral for the necrobiosis lipoidica diabeticorum, diabetes management, blood pressure management, and medication management.   (Tr. 585-587, 589, 591, 593, 595-597, 599, 602, 715, 875, 881, 884, 890, 898, 915).

Plaintiff underwent an x-ray of his shoulder on October 8, 2015, and the conclusion was ". . . NO GROSS ACUTE FRACTURE OR DISLOCATION…MILD DEGENERATIVE CHANGE…NO SOFT TISSUE ABNORMALITIES . . ."   (Tr. 601).

### ANALYSIS

First, Plaintiff argues that the ALJ failed to evaluate his RFC properly.   More specifically, Plaintiff asserts the ALJ erred in evaluating Plaintiff's mental RFC regarding concentration, persistence, and pace; the ALJ failed to develop the record fully and, as a result, failed to evaluate properly Plaintiff's ability to reach and handle; and the ALJ erred in giving "great weight" to Frank Buda's medical opinion instead of reviewing all the evidence in the record.

---

[9]    Dysuria   refers   to   "painful   or   difficult   urination."   https://medical-dictionary.thefreedictionary.com/dysuria, visited on April 13, 2020.

[10]    Polyuria   refers   to   an   "excessive   excretion   of   urine."   https://medical-dictionary.thefreedictionary.com/polyuria, visited on April 13, 2020.

The ALJ's RFC assessment and the hypothetical question posed to the VE must both incorporate all the limitations that are supported by the record.   *See Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).   This is a well-established rule.   *See Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009)(collecting cases).   If the ALJ finds that a plaintiff has a moderate limitation in maintaining concentration, persistence or pace, that limitation must be accounted for in the hypothetical question posed to the VE.   The Seventh Circuit has repeatedly held, with exceptions not applicable here, that a limitation to simple, repetitive tasks or unskilled work does not adequately account for a moderate limitation in maintaining concentration, persistence or pace.   *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010); *Yurt*, 758 F.3d at 857; *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015); *Taylor v. Colvin*, 829 F.3d 799, 802 (7th Cir. 2016); *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018), as amended on reh'g (Apr. 13, 2018); *DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019).   "The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity."   *O'Connor-Spinner*, 627 F.3d at 620.

Here, the ALJ found that Plaintiff had moderate difficulties in maintaining concentration, persistence or pace at step 3 of the sequential analysis when determining whether Plaintiff's mental impairments meet or equal a listed impairment.   The ALJ noted that while the step 3 determination is not a mental RFC assessment, the ultimate RFC assessment "reflects the degree of limitation found in the 'paragraph B' mental

functional analysis."  (Tr. 29).

In regard to mental limitations, the ALJ's RFC finding noted that Plaintiff "is further limited to remembering, understanding and attending to simple, routine tasks." (Tr. 30).   Plaintiff suggests this language does not account for moderate limitations in concentration, persistence or pace, and this Court agrees. A limitation to simple, routine and rote tasks with little to no changes does not account for difficulties in concentration arising from anxiety and depression.  *See Varga*, 794 F.3d at 815.   Moreover, the ALJ used the terminology that the Seventh Circuit has continually viewed as insufficient.

The Seventh Circuit recently addressed this issue in *Martin v. Saul*, 950 F.3d 369 (7th Cir. 2020) and *Crump v. Saul*, 932 F.3d 567 (7th Cir. 2019).   In *Martin*, the court held the ALJ correctly accounted for Martin's concentration, persistence or pace limitations by not "assuming that restricting [Martin] to unskilled work would account for her mental impairments."  *Id*. at 374.  "The ALJ incorporated pace-related limitations by stating that Martin needed flexibility and work requirements that were goal-oriented."  *Id*.  On the other hand, the ALJ in *Crump* used language in the RFC that the Seventh Circuit has repeatedly found insufficient such as, "simple, routine, repetitive tasks with few workplace changes."  *Crump*, 932 F.3d at 569.   The court held the ALJ failed to incorporate limitations like Crump's likelihood of being off-task twenty percent of the time.  *Id*. at 570.

Here, the ALJ did not go as far as the ALJ in *Martin* did.   The present case is

similar to *Crump* in that the ALJ limited Plaintiff to work involving "simple, routine tasks," without adding more relating to concentration, persistence or pace.   This, as established above, is not enough.   "More to it, observing that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis, including, for example, over the course of a standard eight-hour work shift."   *Crump*, 932 F.3d at 570.   The Seventh Circuit put it succinctly in *Martin*:

> As we have labored mightily to explain, however, the relative difficulty of a specific job assignment does not necessarily correlate with a claimant's ability to stay on task or perform at the speed required by a particular workplace. . . . Put another way, someone with problems concentrating may not be able to complete a task consistently over the course of a workday, no matter how simple it may be.

950 F.3d at 373-374.   Therefore, without more, the RFC does not adequately account for moderate limitations in concentration, persistence, or pace.

Plaintiff argues the ALJ failed to develop the record fully and erred in not obtaining all the medical records.   To support this assertion, Plaintiff points out that there were missing medical records, and the ALJ acknowledged the absence of these medical records at the evidentiary hearing.   An ALJ has an independent duty to develop the record fully and fairly.   *See* 20 C.F.R. § 404.1512(b).   "Social Security proceedings are inquisitorial rather than adversarial.   It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits [internal citation omitted]."   *Sims v. Apfel*, 120 S. Ct. 2080, 2085 (2000).

At the evidentiary hearing, the ALJ asked Plaintiff's counsel "[a]nd is there

anything we're still waiting on?" to which Plaintiff's counsel answered, "[n]o, sir."   (Tr. 45).   Later, when discussing Plaintiff's mental health treatment, the ALJ acknowledged the record looked somewhat incomplete.   (Tr. 55).   The Commissioner argues that Plaintiff was represented by counsel and the ALJ was entitled to assume that he put on his best case for benefits.   However, as explained above, the ALJ still had a duty to compile a complete record.   An ALJ satisfies the duty to develop the record when the ALJ investigates for possible disabilities and discovers all relevant evidence.   *See Jozefyk v. Berryhill*, 923 F.3d 492, 497 (7th Cir. 2019).   To prove the ALJ failed, "the claimant must point to specific, relevant facts that the ALJ did not consider."   *Id*.   The Plaintiff did just that in his brief.

The unfortunate result was a gap in the record regarding missing mental health records.   An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions."   *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009)(citations omitted).   The Court concludes that the ALJ failed to build the requisite logical bridge here.

Plaintiff argues the ALJ failed to evaluate properly Plaintiff's ability to reach and handle by failing to mention certain evidence between January 2016 and August 2017. The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence

supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).   The ALJ must consider all relevant evidence.   *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); 20 C.F.R. § 404.1545 (a)(1) and (3).   Moreover, the ALJ must "engage sufficiently" with the medical evidence.   *See Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016).   The ALJ "need not provide a complete written evaluation of every piece of testimony and evidence." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015)(citation and internal quotations omitted).   However, the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions."   *Terry*, 580 F.3d at 475 (citations omitted).   The ALJ "cannot simply cherry-pick facts supporting a finding of non-disability while ignoring evidence that points to a disability finding."   *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Plaintiff argues the ALJ failed to discuss medical records from fourteen appointments between 2016 and 2017 that indicated issues such as shoulder pain, arthritis, and hand and wrist pain.   Plaintiff is correct in this assertion.   Any mention made was within one small paragraph at Tr. 31.   The ALJ consolidated numerous pages of medical records into a mere five sentences.   The ALJ also failed to mention objective findings that go against evidence supportive of the ALJ's decision such as PT Murphy's objective notes at Tr. 615 of bilateral shoulder pain with deficits that required an increase in range of motion, flexibility, and strength; physical exams by Dr. Naseer at Tr. 505 that

revealed tenderness of the left shoulder with moderately reduced range of motion; and objective findings from the Orthopedic and Sports Medicine Clinic of positive impingement signs of the right shoulder at Tr. 633, 640, 760, 767, 771, 774, and 778 and of the left shoulder at Tr. 640, 760, 767, 770, 774, and 778.   That, as stated above, is not permissible.

Defendant argues that the ALJ did not ignore certain medical evidence. However, what Defendant fails to address is how the ALJ may not have engaged sufficiently with the medical evidence, which is what happened here.   With that said, this Court agrees the ALJ did not adequately consider all medical records.

Plaintiff argues the ALJ erred in giving "great weight" to Frank Buda's medical opinion instead of reviewing all the evidence in the record.   In his decision, the ALJ gave Dr. Buda's opinion "great weight" because it was "supported by, and consistent with, the record . . ."   (Tr. 33).   However, this cannot be the case due to the ALJ's lack of engagement with certain medical evidence.   Defendant argues that Plaintiff is incorrect by pointing to case law that says the ALJ does not need to write a complete evaluation of everything in the record.   What Defendant does not say, however, is that the ALJ must engage sufficiently with the medical evidence, and, for the reasons stated above, the ALJ did not do so.

For Plaintiff's second issue, Plaintiff argues that the ALJ erred in not identifying chronic kidney disease ("CKD") as a severe impairment at step 2.   Consequently,

according to Plaintiff, the ALJ failed to evaluate properly the combined effects of Plaintiff's impairments, and this changed the outcome of the case.    Plaintiff acknowledges that a failure to find an impairment as "severe" during step 2 can be harmless error, but Plaintiff alleges that the ALJ failed to consider the combined effects of Plaintiff's impairments.

The failure to designate CKD as a severe impairment, by itself, is not an error requiring remand.    At step 2 of the sequential analysis, the ALJ must determine whether the claimant has one or more severe impairments.    This is only a "threshold issue," and, as long as the ALJ finds at least one severe impairment, he must continue with the analysis.    And, at step 4, he must consider the combined effect of all impairments, severe and non-severe.    Therefore, a failure to designate a particular impairment as "severe" at step 2 does not matter to the outcome of the case as long as the ALJ finds that the claimant has at least one severe impairment.  *See Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012)(citing *Castile v. Astrue*, 617 F.3d 923, 927-928 (7th Cir. 2010)).

The ALJ found Plaintiff had the severe impairments of diabetes mellitus, diabetic retinopathy, diabetic neuropathy, bilateral carpal tunnel syndrome, DJD of the bilateral shoulders, degenerative disc disease of the lumbar spine, obesity, and depressive disorder.    However, regardless of the designation of impairments as severe, the ALJ is still required to consider the combined effects of all impairments in determining Plaintiff's RFC.    "When assessing if a claimant is disabled, an ALJ must account for the

combined effects of the claimant's impairments, including those that are not themselves severe enough to support a disability claim." *Spicher v. Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018).

It does not appear that the ALJ adequately accounted for the combined effects of Plaintiff's impairments, if at all.   The only mention the ALJ gave as to Plaintiff's CKD was at Tr. 27 where the ALJ said, "[i]n addition, the record reflects chronic kidney disease . . . all of which are generally well-managed with conservative treatment, not vocationally relevant, and/or not discussed as a significant source of functional limitations in the record."   The ALJ also said:

> In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . Thus, after considering the entire record, the undersigned finds the record supports the limitations set forth in the RFC but no additional limitations . . .

(Tr. 30, 33).   The Defendant argues that this Court should reject Plaintiff's arguments, saying Plaintiff simply disagrees with the ALJ's conclusion.   However, it is not that simple.   This Court is not convinced that the ALJ considered the entire record.   Even if the ALJ considered the entire record, this Court is not convinced the ALJ engaged sufficiently with the medical evidence and combined impairments to build a logical bridge so as to allow the ALJ to assert that substantial evidence supports his decision.

This Memorandum and Order should not be construed as an indication that the Court believes Plaintiff was disabled during the relevant period or that he should be

awarded benefits.   On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## CONCLUSION

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

Dated:   April 20, 2020.

Digitally signed
by Judge Sison
Date:
2020.04.20
13:02:55 -05'00'

GILBERT C. SISON
United States Magistrate Judge